The next argument on our calendar is Karen Gwillan v. Berryhill. I think we've changed the name. Thank you. You may proceed. Thank you, Your Honor. May it please the Court, my name is Carolyn Kubitschek, and I represent the appellant Karen Gillen. Ms. Gillen focuses in her oral argument on three ways in which the administrative law judge erred. First, in failing to develop the record. Second, in improperly rejecting the diagnosis of the treating physician. And third, in improperly evaluating Ms. Gillen's non-exertional impairment of migraine headaches. With regard to the first issue, as the Court is probably aware, the record is about the shortest administrative record that has come to this Court in the past decade or so. And it shows various errors, various areas in which the ALJ should have but failed to develop the evidence. First, the ALJ did not obtain an opinion from the treating physician. The ALJ... And then they say, we did. And then, only in your reply brief, you say, but the way they asked these things was not adequate. Now, you know, that isn't an argument you've made. You've got a very good argument with respect to what the ALJ did with respect to lupus and the treating physician's thing. I mean, why don't you concentrate on that one? Yes, Judge Calabresi. With regard to Ms. Gillen's impairment of lupus, Ms. Gillen was diagnosed by her treating physician as suffering from lupus. Are you talking about Dr. Oliver? Dr. Garth Oliver. Dr. Oliver based his diagnosis on three positive ANA tests, and that is the gold standard for diagnosing lupus. In addition, as counsel points out, the ANA test results are not by themselves diagnostic. But she suffered, Ms. Gillen, also suffered from the red facial rash, which is so characteristic that it gives lupus its name. She suffers from photosensitivity, sensitivity to light, and she suffers from joint pain. Those four factors were the underpinnings of Dr. Oliver's diagnosis. And Dr. Oliver's diagnosis was not contradicted by any other physician who had examined Ms. Gillen. And the only contradictory diagnosis came from two doctors who had neither examined nor treated her and were not even given the appropriate medical evidence to review. Let me ask you, did the ALJ say that there was no diagnosis by the treating physician of lupus? Yes, he did. And was that erroneous? That was erroneous. And isn't that enough under Chenery so that we have to reverse? Yes, Your Honor. Do you know? Yes. The fact that there was other evidence or so on might be relevant if this is a district court, but this is an administrative law case. So even if we wanted to decide that way, I mean, you have these arguments, but that's not something we can do under Chenery. That's correct, Your Honor. Counsel, is it sufficient that the Social Security Administration says that they asked Dr. Oliver twice to submit, to give them a medical source statement, and he never did? Your Honor, they say that in their brief. The administrative law judge did not say that because the administrative law judge never asked Dr. Oliver for his opinion on anything. Who wrote those two letters? The two letters were, well, we haven't ever seen those letters. And there is no evidence that those letters exist. The government says that when the case was pending before the state agency at the time that Ms. Gillen applied for benefits, they asked for a medical source statement, whatever that means. And I don't think Dr. Oliver can be expected to know that a form that says medical source statement is asking him to please clarify, number one, your diagnosis, doctor, and number two, how does your patient's condition affect her ability to function on a day-to-day basis, which is critical to any definition of disability. Wait a minute. Don't give away too much here. Did they ask for a medical source statement? We don't concede that they did, no. That's what I'm wondering. I thought you said they asked for one. No, I said the government says that they asked for one and points to some acronyms and initials in the administrative record. But the government also says that they received something, which we know whatever they received was only the raw medical data, the treatment records and the laboratory test results. They did not ever receive a statement from Dr. Oliver as to how Ms. Gillen's illness affects her functional ability. Did they send anything to the doctor that told him what MSS stands for? No, they sent nothing to the doctor telling him what MSS stands for. Is there anything in a Social Security manual that explains that? Nothing that Dr. Oliver would have, no. Do you know is it an accepted acronym in this field or not? Not in the field of medicine. It's an accepted acronym within the Social Security bureaucracy, but outside of Social Security, MSS could mean manuscripts. Now, with regard to the migraine headaches, the ALJ found that Ms. Gillen's migraines are severe. That is, they significantly affect her ability to function in her daily life. Yet when it came down to evaluating Ms. Gillen's disability and her ability to work, the ALJ completely ignored the fact that she had previously decided that Ms. Gillen suffered from severe migraine headaches. She did not explain how she reached the result that Ms. Gillen could function despite the migraine headaches. She didn't explain, for example, whether she discredited Ms. Gillen's statements and the statements of Dr. Oliver that Ms. Gillen suffers extremely debilitating migraine headaches two or three days a month, so debilitating that she is bedridden and she requires assistance from her mother to perform the activities of daily living. So did the ALJ decide, oh, Ms. Gillen can still work even though she will be absent. Ms. Gillen is employable even though she will be absent two or three days every month on a random basis. Or did the ALJ determine that, oh, on days that she has headaches, Ms. Gillen is still capable of going to work and performing a normal job? The ALJ simply didn't address that issue at all. It did not explain how the ALJ got to the result that the ALJ reached, which is that Ms. Gillen could return to her former work. Or did the ALJ decide that even though the medical evidence says Ms. Gillen's headaches have been increasing infrequently, that there was no difference between Ms. Gillen's condition on the date of the hearing and her condition back in 2005 when she had been laid off? And that gap here effectively precludes effective appellate review on that issue as well. Thank you. You've reserved two minutes for rebuttal.  We'll hear from Social Security. Hi. Special Assistant U.S. Attorney for the Commissioner. I'd like to start with- Talk right into the microphone. Oh, sorry. I'd like to start first with your concern regarding the, what counsel calls cryptic MSS requested language. Dr. Oliver would not have received something that said MSS requested. That's the agency's internal document. Do you have copies of the letters that were sent in? It is our process that we only include in the record a copy of the actual letter sent out if, in fact, the doctor sends nothing back. Since the doctor returned information, we don't, as a matter of course, keep those letters in. I do, I mean, it's a standard form letter that we send out in all of the cases, which essentially asks for, you know, a medical, asks for a statement regarding the patient's abilities to do work-related activities, including sitting, standing, that sort of thing. Well, that's a no. You don't have copies. I have a copy of the standard form letter. It's not in the record. Not one directed to Dr. Oliver. Not one directed to Dr. Oliver. But the note confirms that, in fact, we send him our standard form letter. The MSS request is essentially language that would have been added to the request. Didn't the ALJ just skip over the fact that Dr. Oliver never elaborated on his diagnosis of lupus and never was asked, nor did he opine, whether Ms. Gillen was capable of working at her old job or any job? There was a gap in the record. Do you agree? No, because, Your Honors, under the regulations, under 20 CFR 404, 1512, and 1513, we're required as an agency to make a request for the medical source statement and one follow-up, and the record shows the same. But the ALJ has a duty to make a complete record. But the ALJ is not required to reach out to a doctor who has repeatedly, who has, after the two attempts, not complied with our request. We can't make them complete a medical source statement. It's not something like you could subpoena someone for a record, potentially, but the medical source statement is not something that preexists. This is something that we would be asking him to create, and we've already asked him for it. We asked him twice, as the regulations required, and our regulations state that where we have, you know, where an ALJ has reason to know that, you know, we've reached out and we've asked and they're not complying. What in this record tells us you asked for a medical source statement? On pages 285 and That's where the fax is? No, that's where our disability worksheet, which is the internal agency record of our communications, indicates that MSS was requested, which, as I indicated, means that the language requesting a medical source statement would have been included in the letter seeking records. You're talking about page 285? Page 285. That's not a fax? That is not a fax. That is an internal agency record. It says at the top, fax. What does that mean? F-A-X. Or maybe F-A-X is a different acronym. I'm not seeing what you're seeing about fax. It just says case development sheet, page 285. It's 05 slash 22, SCA 200, and then I guess a little blurred, EME, fax, MER. You don't see any of that at 285? No. Let me Well, in any event, so where in the record is the document where you requested a medical source statement? We don't, as a matter of course, include that document in the record. I don't know if you do it as a matter of course. Is it in our record? It's not in our record. No, we don't have it. We do not have it. Well, then how are we supposed to decide whether you sent it? Because it's an agency. This is the agency's normal course statement. I don't care about what is normal. What is before us is the record, and that isn't in the record. The other thing is, is it in the record that the treating physician said that she had lupus, and is it in the record that the ALJ said there is no diagnosis by the treating physician? What the ALJ said was that there's no formal diagnosis or treatment for lupus, and what the ALJ is saying is essentially when the doctor diagnosed lupus, on the same day, at the same time, he also diagnosed other fatigue and malaise, and he also diagnosed multijoint pain, which are differential diagnoses. I don't care how many other things he diagnosed. He diagnosed lupus, and the ALJ says he didn't diagnose lupus because he also diagnosed other things, and that seems to me an extraordinary statement. The treating physician says A plus B, C, and D, and the ALJ says, oh, I'm not going to pay attention to A because he doesn't say more. Now, whether we ask for more or not is something that we've been asking, but even if we didn't, he did say A, and the ALJ doesn't say so, and lupus is an automatic disability, isn't it? No, it is absolutely not an automatic disability. First to start, the ALJ did not say that. Not in the list of categories? But only if you satisfy all the requirements, which she did not hear, and it has never been argued that she has met the requirements in the listing. Excuse me. Yes. Your definition that you mentioned is one set of requirements. Your regulation talks about a different set of requirements, don't they? Yes. Yeah, so you are relying on there not being a set of requirements which aren't the set of requirements that your regulations say should be there. Isn't that a problem? I'm sorry, I don't understand your question. You cite some particular set of requirements. Diagnostic, medical diagnostic. Yeah, there's a difference between the medical diagnostic criteria used for a doctor to diagnose lupus and what is required to be disabled under the Act, which is not just a diagnosis of lupus but a diagnosis of lupus plus a certain level of functional disability. So those are two different questions altogether, whether or not it's diagnosable or not. But as to whether or not the ALJ actually said there's no diagnosis, he did not say there's no diagnosis, he said there's no formal diagnosis. And the reason he's saying that is because at the same time he's diagnosing two other things that would be essentially the other things you would diagnose. What is a formal diagnosis? Like a diagnosis that is essentially we're sure, not a tentative diagnosis. He says there is lupus, and then he says there are other things. And the ALJ, who is not a doctor, chooses to say that because he says there were other things, he wasn't saying what he said. Now, why isn't that substituting a non-doctor for a doctor's decision, which we have held in innumerable cases, cannot be done? Now, you know, if the ALJ, and I don't know what development, he did say there wasn't a formal diagnosis. Now, I don't know what a formal diagnosis is when I get a doctor saying this is so and some other things as well. It's like if a doctor said you have cancer or you have an autoimmune disorder and they were both diagnosed. He didn't say or. Or. Did he say or? He did not say or, but the two. Why didn't he give us an example of a doctor saying or when that's not the case? Because if you were to diagnose lupus, lupus would have covered all of the symptoms, in which case there would have been no purpose to also diagnosing the fatigue and the multijoint pain. Why not? Why can't a person have more than one disease? Because multijoint pain and the other fatigue and malaise are diagnoses that are typically used, you know, while diagnoses are being ruled out. This is not. Typically. Typically what? Somebody has lupus and has some other symptoms which may be as a result of lupus or maybe also because he also has these other things. I must. I really do not understand the government's argument in this case. And I rarely say that, but I really do not understand the government's argument. Well, ultimately, since this is obviously not a productive area of argument, I would say that it doesn't ultimately matter under Second Circuit case law what you characterize the condition as because ultimately the entire constellation of symptoms. Counsel? Yes. We're all aware that Ms. Gillen was pro se at the ALJ hearing? Yes, she was. Don't we interpret the record with that in mind a little more liberally than if she was represented by counsel at that time? In terms of whether there's substantial evidence in the record to support? Not that I'm aware of, no. In terms of whether the case was made. In terms of the ALJ's decision, regardless, has to be supported by substantial evidence. And here substantial evidence, regardless of what her disorder, regardless of how you characterize it, there was evidence in the record indicating that it did not rise to a level of disability. And so regardless of what it's called, the particular constellation of symptoms, when you look at her examination findings, when you look at her ability to, her activities of daily living, such as her ability to take care of her children, all of the other things in the record indicate that regardless of what we call it, we can call it lupus, we can call it disease X, it doesn't really matter ultimately because substantial evidence including the opinions of the state agency doctors support it. Who never saw her. Who never saw her, but there isn't any medical opinion from someone who had seen her, so that is, those were the two best opinions of record, given that we had reached out and did not receive any. Can I come back to the document? You've agreed, or you've told us, I guess, the document that you say asked for the medical statement is not in our record, right? The letter itself is not in the record. All right. Is there a form letter the agency uses for that request? Yes. Is that form letter findable somewhere? I have a copy of it, a redacted copy of it. Is there a site? It's not available on the Internet, for example, no. Is it in a manual? No, it is a document created by the Connecticut Office of Bureau of Rehabilitation Services on our behalf. Where does one find it? One would only find it if they were to receive one. If they were to seek one? If they were to receive one, or we would obviously provide a copy to the court at its request. You're saying the doctor did receive one. Well, we know the doctor received it because he sent in information in response to it, not all of the information we requested, but he received something, so he obviously received the letter from us. How do we know he received it? We don't know. He certainly got a document from you. That is true. Do we know whether he got anything that requested a medical statement? Our record indicates the MSS requested language was included in the letter. That is what that information on page 285, the case development worksheet, that is what that means to us in the agency. That means that the language — When you say it means, are you referring to the MSS acronym? Yes. Is there anything that would tell the doctor what that meant? Yes, their letter would include language that asks them — When you say it would include it, did it? According to our records, yes, it did. According to your record, does your record mean you have a copy of it in your record? No. Well, then how does your record show it? Because under our agency protocols, when we send out — How do we know, looking at the record before us, what it was that this doctor got? How do we know that? We look at the record. In the record, there is nothing. You tell us this is the letter we normally send out. Well, that may be true. But this time, somebody in your office may have sent a sheet which say, tell us something. And the doctor said, something. How do we know? You know, we're a court. We don't go on what you tell us is in your records, and we don't go on what the plaintiff says is in their record. We go on what the record before us is. Well, I cannot point to something in the actual letter itself. Does the letter you say you normally send out use the acronym MSS? No, it does not. It does not. Does it use the words that MSS stands for? It says, please include a statement regarding your patient's ability to perform the following work activities, such as sitting, standing, walking. It doesn't use the word functional? It doesn't use the word — Isn't that what the regulation calls for? The regulation doesn't call for us to state it as anything. No, no, no, no, no. Does the regulation want the doctor to give a functional assessment? A statement regarding their abilities to work, yes. Does it say ability to work, or does it have some phrase that uses the word functional? I'm not sure exactly what you're talking about. I'll try again. Does your regulation ask the doctor to make an assessment of some concept that uses the word functional? Yes. The regulation says that? I mean, excuse me, can you — I mean, it's your regulation. I just want you to tell me what you're requiring of me. What it is, is that — What you can still do despite your impairment. What? What does it say? It's 20 CFR 404.15.13. It says the Social Security Administration must request a medical source statement about what you can still do despite your impairments. A medical source statement. Right. The MSS. And didn't the doctor — And did you tell him, your letter that you say you generally send, tell him you wanted a medical source statement? It said we want a statement regarding his or her ability to do work-related activities such as sitting, standing, et cetera. That person is the medical source. And what did the doctor send in response? You said he responded. He responded. Well, in addition to asking for the medical source statement in the same letter, we asked for records generally. And he decided to provide the records generally, but not the medical source statement. The records had the diagnosis of lupus in them, didn't they? They did. Did you ask for more specifics about lupus and the diagnosis in your letter? No. No. So that what the doctor said about lupus and some other diseases was not something that you ever informed the doctor was inadequate? No. Under our regulations, 404.15.12 and 15.13, we make the request, we make a follow-up, and then — Let me just stay with that. Did the ALJ say that he did not formally diagnose lupus? Yes. Yeah. And did the doctor say he had lupus, she had lupus, and some other things which can be symptoms of lupus? Is that what the doctor said? Is that what the doctor said? The doctor, in her doctor's diagnosis, said lupus plus X, Y, and Z, which you tell us are also symptoms of lupus but might be a separate disease. The ALJ just said that it was not a formal diagnosis. That's right. Okay. Thank you. Ultimately, I mean, I come back to the fact that this, regardless of what it's called, it was appropriately evaluated under a very similar listing to the listing we would use for lupus, in fact, an easier one to meet, and that during the RFC we considered the constellation of symptoms and, you know, relied on medical opinion evidence as well as the evidence of record to reach what is an RFC that is consistent with her work. Thank you. Your answer just a minute ago was the ALJ said the treating physician did not make a formal diagnosis of lupus. Are you quoting the ALJ there? Yes. The formal diagnosis language is from the ALJ, and that comes from, again, as I was indicating, the fact that there are differential diagnoses at the time, the fact there was a referral out to a rheumatologist who would be the one who would actually really, you know, make an ultimate diagnosis of lupus, and just the situation at the time, which is basically that the diagnosis of lupus comes in between visits when there's no new information. I'm not asking whether it was correctly diagnosed. I'm trying to understand first what the doctor said and then what the ALJ said he said. Yes. You're saying he said he did not make a formal diagnosis. Formal. Is there anything in Social Security handbook or regulations that distinguishes between a diagnosis and a formal diagnosis? No. Then why would an ALJ use the word formal if there's no such designation for him or her to use? Well, the ALJ has to use a lot of words that really are more coming out of the medical arena. What are we to make of that word? What does that word mean if it isn't in the regulations? What does that mean? It's really more of an understanding from a medical perspective that this was something that was sort of more open-ended, and, in fact, you know, in addition to- Well, you're saying that that's what it means, but I don't know. I mean, frankly, I can't understand. Suppose he had said the doctor had not made a banana diagnosis of lupus. What does that mean? I think formal is a little bit more understandable. Did he make a diagnosis of lupus or not? Formal? Honestly, I think in the context of the case, and it was a fair use of the term, and ultimately it does not matter because the characterization of the disease doesn't matter. I understand the government has to be here and make the best of what they're given. I get that. But you don't have to tell us that everything an administrative official did, which on its face is absurd, you don't have to say it's not absurd. You could stand there and say he really used an inartful way of describing it and not defend him to the hilt. But if you want to say it was brilliant of him to say there's no formal diagnosis, you're entitled to make that argument. But then you have to tell us why it's okay. Go ahead. I honestly think in me reading this record, having viewed a lot of cases and read a lot of medical evidence, it seemed to me to be a fair use of the term in the context of how the diagnosis was unfolding. Obviously, if you disagree, you're the court, and I see that that is the case. But I felt that that was a fair characterization of the state of the diagnosis at the time. And it was the equivalent of saying that this doctor just did not make a diagnosis. But essentially it was tentative. It was tentative? In the context of the differential diagnosis, the fact that he sent her out for blood work. By the way, the lupus blood work that he sends her out for at that time ends up being negative. What made it tentative? The combination of the fact that it was diagnosed at the same time as the differential diagnosis, the fact that a rheumatology referral was pending, the fact that he was sending her out for blood work for lupus, which comes back negative, the fact that the timing of the diagnosis in the context of all that makes the use of the word formal, I think, fair. Obviously, you don't have to disagree. I mean, you don't have to agree, but that's how I viewed the case and continue to. Thank you. Thank you. Ms. Kubitschek, you've reserved two minutes for rebuttal. Victor? Andi? First, with regard to Dr. Oliver, getting a report from Dr. Oliver, the court understands, I think, that the request for a MSS did not come from Social Security. It came from the state of Connecticut, which was trying to do work up the file. So there isn't a form letter. We don't know what the letter said. What we do know is, according to Social Security's own file, they addressed one to Dr. Oliver and received records, and then they addressed another one to save in medical practice, not directly to Dr. Oliver. So to the extent that the government concedes that you have to make a request and a follow-up request, the government didn't do that in this particular case. Secondly, as this court has said repeatedly, for example, in the case of Cruz against Sullivan, if you don't have a report from the treating doctor, the ALJ can say to the claimant, could you get a letter from your doctor? We really need it. This woman, as the court has said, was pro se. She had no idea that a report from her doctor would be so significant. She knew that his medical records were already in the file, but she didn't know that this court values the opinion of the treating physician, that the Social Security Administration needs to know the treating physician's opinion and the regulations, by the way, Judge Newman say, to request on a function-by-function basis, as you asked, counsel. How does your patient's illness affect her ability to function in the daily life on a function-by-function basis? And that was missing from the file here. And finally, why would the ALJ say there was no formal diagnosis of lupus? Because the ALJ said, meant, oh, she doesn't have lupus, and tried to wiggle out of a diagnosis which ---- The ALJ said, I don't think she has lupus. I don't think, yes. I'm a better doctor than Garth Oliver is. Therefore, ignoring a diagnosis which Dr. Oliver wrote and exists in the record, diagnosis of lupus with the International Classification of Diseases classification number that the International Medical Committee gives to lupus. And it doesn't say differential diagnosis. Dr. Oliver didn't write, well, maybe it's lupus, maybe it's just joint pain. He said, this is lupus. And as you said at the beginning, Judge Calabresi, the Chenery Doctrine does not allow this court to then affirm the administrative law judge for some other reason. Thank you. Thank you both for a lively argument. The next two cases on our calendar are on submission, so I'll ask the clerk to adjourn court. Court is adjourned.